UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

_____

Kathleen Zubrycki
*(In the space above enter the full name(s) of the plaintiff(s).)*

-against-

New York State, Department of Transportation
New York State, Department of Civil Service
New York State, Office of the State Comptroller

*(In the space above enter the full name(s) of the defendant(s).*
*If you cannot fit the names of all of the defendants in the space*
*provided, please write "see attached" in the space above and*
*attach an additional sheet of paper with the full list of names.*
*Typically, the company or organization named in your charge*
*to the Equal Employment Opportunity Commission should be*
*named as a defendant.  Addresses should not be included here.)*

**U.S. DISTRICT COURT**
**FILED**
**SEP 0 2 2008**
**S.D. OF N.Y.**

**PRO SE OFFICE**

**THIRD AMENDED**

**COMPLAINT**
**FOR EMPLOYMENT**
**DISCRIMINATION**
07 -CV- 4735 (KMK(MDF)

Jury Trial: ☑ Yes ☐ No
*(check one)*

This action is brought for discrimination in employment pursuant to: *(check only those that apply)*

✓    Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e
to 2000e-17 (race, color, gender, religion, national origin).
***NOTE:*** *In order to bring suit in federal district court under Title VII, you must first obtain a*
*Notice of Right to Sue Letter from the Equal Employment Opportunity Commission.*

_____    Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§
621 - 634.
***NOTE:*** *In order to bring suit in federal district court under the Age Discrimination in*
*Employment Act, you must first file a charge with the Equal Employment Opportunity*
*Commission.*

✓    Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 -
12117.
***NOTE:*** *In order to bring suit in federal district court under the Americans with Disabilities Act,*
*you must first obtain a Notice of Right to Sue Letter from the Equal Employment Opportunity*
*Commission.*

✓    New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297  (age,
race, creed, color, national origin, sexual orientation, military status, sex,
disability, predisposing genetic chacteristics, marital status).

_____    New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to
131 (actual or perceived age, race, creed, color, national origin, gender,
disability, marital status, partnership status, sexual orientation, alienage,
citizenship status).

## I.     Parties in this complaint:

A.     List your name, address and telephone number.  Do the same for any additional plaintiffs named.
Attach additional sheets of paper as necessary.

Plaintiff     Name _____ Kathleen Zubrycki _____

Street Address _____ 62 Violet Hill Road _____

County, City _____ Dutchess, Rhinebeck _____

State & Zip Code _____ New York, 12572 _____

Telephone Number _____ 845-876-3542 _____

B.     List all defendants' names and the address where each defendant may be served.  Make sure that the
defendant(s) listed below are identical to those contained in the above caption.  Attach additional sheets
of paper as necessary.

Defendant     Name _____ New York State, Department of Transportation _____

Street Address _____ 50 Wolf Road _____

County, City _____ Albany, Albany _____

State & Zip Code _____ New York, 12232 _____

Telephone Number _____ 518-457-6460 _____

*Continued next sheet*

C.     The address at which I sought employment or was employed by the defendant(s) is:

Employer _____ New York State, Department of Transportation _____

Street Address _____ 4 Barnett Boulevard _____

County, City _____ Dutchess, Poughkeepsie _____

State & Zip Code _____ New York, 12603 _____

Telephone Number _____ 845-431-5715 _____

## II.     Statement of Claim:

State as briefly as possible the facts of your case, including relevant dates and events.  Describe how you were
discriminated against.  If you are pursuing claims under other federal or state statutes, you should include facts
to support those claims.  You may wish to include further details such as the names of other persons involved
in the events giving rise to your claims.  Do not cite any cases.  If you intend to allege a number of related
claims, number and set forth each claim in a separate paragraph.  Attach additional sheets of paper as
necessary.

A.  The discriminatory conduct of which I complain in this action includes: *(check only those that apply)*

_____ ✓ _____     Failure to hire me.

_____ ✓ _____     Termination of my employment.

_____ ✓ _____     Failure to promote me.

_____ ✓ _____     Failure to accommodate my disability.

_____ ✓ _____     Unequal terms and conditions of my employment.

*Rev. 05/2007*                                                     2

**I.**  **Parties in this complaint continued:**

     B. Defendant:    New York State, Department of Civil Service
                  80 South Swan Street
                  Albany County, Albany
                  New York, 12239


     B. Defendant:    New York State, Office of the State Comptroller
                  110 State Street
                  Albany County, Albany
                  New York, 12236

✓          Retaliation.

✓          Other acts *(specify)*: Sexual harassment                    .

**Note:** *Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.*

B.  It is my best recollection that the alleged discriminatory acts ~~occured~~ began on: April 19, 2002
                                                                              *Date(s)*

C.  I believe that defendant(s) *(check one)*:

    ✓          is still committing these acts against me.

    _____    is not still committing these acts against me.

D.  Defendant(s) discriminated against me based on my *(check only those that apply and explain)*:

    ☐  race  _____          ☐  color  _____

    ☑  gender/sex  female              ☐  religion_____

    ☐  national origin  _____

    ☐  age.  My date of birth is _____ *(Give your date of birth only if you are asserting a claim of age discrimination.)*

    ☑  disability or perceived disability, Post Traumatic Stress Disorder *(specify)*

E.  The facts of my case are as follow *(attach additional sheets as necessary)*:

    as per Attachment #1
    _____
    _____
    _____
    _____
    _____
    _____
    _____

**Note:** *As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, the New York State Division of Human Rights or the New York City Commission on Human Rights.*

## III.  Exhaustion of Federal Administrative Remedies:

A.  It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding defendant's alleged discriminatory conduct on: _____ as per Attachment #2 _____ *(Date)*.

B.      The Equal Employment Opportunity Commission *(check one)*:

_____      has not issued a Notice of Right to Sue letter.

___✓___       issued a Notice of Right to Sue letter, which I received on March 10, 2007 *(Date)*.

> *Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.*

C.      Only litigants alleging age discrimination must answer this Question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding defendant's alleged discriminatory conduct *(check one)*:

_____      60 days or more have elapsed.

_____      less than 60 days have elapsed.

## IV.    Relief:

**WHEREFORE**, plaintiff prays that the Court grant such relief as may be appropriate, including injunctive orders, damages, and costs, as follows: _____

attorney's fees and correction of the wrongs mentioned
in the complaint, and any other relief deemed just and proper.

*(Describe relief sought, including amount of damages, if any, and the basis for such relief.)*

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this 30 day of August , 2008

Signature of Plaintiff    _Kochler Zly ky_

Address    62 Violet Hill Road

Rhinebeck, NY 12572

Telephone Number    845 - 876 - 3542

Fax Number *(if you have one)*    _____

## Introduction

I bring this lawsuit against the Defendants alleging discrimination based on sex and disability and retaliation for resisting illegal discrimination, pursuant to Title VII of the Civil Rights Act of 1964, as amended, (Title VII) the Americans with Disabilities Act (ADA) and the New York Human Rights Law (NYSHRL) against me as an employee of New York State (NYS), as an employee of NYS seeking an appointment, as a former employee of NYS seeking an appointment, as a person with a disability seeking an appointment, and as a person seeking an appointment.

## Parties

1) I am an employee of NYS assigned to the Department of Transportation (DOT.)

2) Defendants NYS, DOT, NYS, Department of Civil Service (DCS) and NYS, Office of the State Comptroller (OSC) are administrative units in the Executive Branch of NYS.

3) The following individuals are NYS employees assigned to DOT: Angela Aiello (Aiello), Michael Anderson (Anderson), Joe Boardman (Boardman), Linda Ciferri (Ciferri), Christopher Crachi (Crachi), Carol Cross (Cross), John Dearstyne (Dearstyne), Bob Dennison (Dennison), Louis DeSol (DeSol), Bascom Durham (Durham), Debi Meade (Meade), Janice Morris (Morris), Bill Oneto (Oneto), Donna Patterson (Patterson), Bill Peckham (Peckham), Jane Peckham (not a state employee), Lawewnce Slomin (Slomin), Joan Trombini (Trombini), Ron Weiss (Weiss), P.T. Wells (Wells), MaryAn Wessles (Wessles), Amelia Meadows-DiLella (DiLella), Concetta Totten (Totten), Lisa Wright (Wright). EXHIBIT 1

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

4) The following individuals are NYS employees assigned to DCS: Richard A. Ciulla, M.D. (Ciulla), Don Hines (Hines), Lisa O'Connor (O'Connor), James Hennessey (Hennessey), Diane Sisario (Sisario), Edwin Reyes (Reyes), Joy Smith (Smith), George Swiers (Swiers), Diane Wallace (Wallace). EXHIBIT 1

## Background

5) I am a female diagnosed with Posttraumatic Stress Disorder (PSD,) a disability within the meaning of the ADA and the NYSHRL.

6) My disability does not prevent me from performing the essential functions of my position, I always performed my duties in a satisfactory and acceptable manner.

7) I do not have to disclose my disability to an employer that hires me, I choose work environments that do not, and would not, contain stimuli that would trigger my PSD.

8) From April 12, 1990 to December 15, 2004 I was assigned to DOT in Region 8 (R8.)

9) From June 15, 2006 to the present I am assigned to DOT in the Main Office.

10) I received competitive appointments to the Stores Clerk 1(SC1), Calculations Clerk 1 (CC1), Engineering Technician (ET), Senior Engineering Technician (SET) and Principal Engineering Technician (PET) titles.

11) On or about December 16 2003, DOT placed me on an involuntary leave of absence despite the fact that I worked on December 16, 2003 and that I could continue to work.

12) On or about December 15, 2004 DOT terminated my employment even though I provided medical documentation on November 22, 2004 that stated that I could work.

13) At the time my NYS employment was terminated I held the title of PET, reported to work in R8 Construction, Anderson was my supervisor.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

14) From July 1993 to December 2003 I worked on federally funded projects, 80 to 100 percent of my salary and employee benefits were paid with federal funds.

15) I worked independently, rarely ever saw or met with anyone, my supervisor was out of the office most of the time.

16) My assignment required me to perform tasks specific to Contracting & Contract Management for Transportation Engineering Consultants, I served as a liaison to the Main Office (MO) for all consultant contract issues, I served as the Contract Manager for Transportation Engineering Consultants on a Term Basis.

17) Anderson nominated me and I served as a Subject Matter Expert for the Re-Engineering Process for Contracting & Contract Management for Consultants.

18) The duties of my position required me to interact with my supervisor, DOT and consultant staff that reported to work at locations throughout NYS and the United States.

19) The duties of my position required me to communicate with my supervisor, DOT and consultant staff via email, phone, pagers, fax, pdf files and written correspondence.

20) I refused to succumb to the discriminatory employment practices of DOT & DCS, due to my own perseverance I was finally reinstated to NYS service on June 15, 2006.

21) DOT R8 organizes and hangs an annual employee art show, all R8 employees and their families can submit contributions to the exhibit.

22) The art exhibit is only hung at the regional office building(s,) never at any other R8 office building even though there are several in and around the regional office building(s.)

23) On information and belief, R8 employees who reported to work at the regional office building(s) were allowed paid time to attend the art exhibit, R8 employees who reported to

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

work locations throughout R8 had to obtain their supervisor's approval to attend the art

exhibit and had to charge their time to their accurals.

24) R8 employees who reported to work locations other than the regional office building(s) make

up the majority, more than eighty percent of R8 employees.

**NYS Sexual Harassment Prevention**

25) NYS Governor's Executive Order #19, "New York State Policy Statement on Sexual

Harassment in the Workplace" (NYS Order #19) requires the head of each department,

agency, board, commission or other entity under the jurisdiction of the Executive Branch of

NYS to have a sexual harassment policy with procedures that provide for the training of all

state employees. The Governor's Office of Employee Relations provides the information to

ensure compliance to this Executive Order.

26) DOT policy and procedures on sexual harassment consists of  bulletins 'Promoting a Positive

and Productive Workplace', 'NYSDOT Internal Human Rights Complaint Procedure' and the

DOT Manual of Administrative Procedures 'Filing a Human Rights Complaint - Department

of Transportation Procedures and Advice on External Remedies.'

27) DOT's sexual harassment prevention training is taught with the participant workbook 'NYS

Policies, Sexual Harassment Prevention: What Everyone Needs to Know' published by the

NYS Governor's Office of Employee Relations and the video 'Not Enough to Know Better.'

28) NYS Order # 19, the NYS Governor's Office of Employee Relations publication, and DOT

policies and procedures state that sexual harassment complaints are confidential and that

protection is provided against retaliation toward any employee who complains.

29) On or about March 12, 2002 I attended DOT's sexual harassment prevention class taught

under Title VII, the NYSHRL, NYS Order # 19 and DOT policy and procedures.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

30) The instructor emphasized and reinforced that inappropriate, offensive behaviors are determined by the recipient, the workplace should be free of materials that are sexually suggestive or explicit and all supervisors are responsible to immediately stop the harassment, the complainant is not required to state 'why' they are offended, they only need to state that they are offended and ask for the harassment to stop.

**DOT 2002 Art Show**

31) On April 19, 2002 as I was in-route to the women's restroom in the building where I was assigned to work, I saw a nude hanging on the wall and I heard several lewd and offensive remarks regarding the nude which triggered my PSD. I felt embarrassed and humiliated.

32) I immediately asked Peckham, the curator of the art show, to remove the nude so that I would not have to see it on my way to the only women's restroom in the building, so I would not have to hear any more lewd and offensive remarks regarding the nude.

33) I told Peckham that I was personally offended and wanted the nude art removed under DOT sexual harassment policy and training. Peckham refused.

34) Many R8 employees were starring at me, some were yelling out in objection to my request to have the nude taken down. I was overcome with humiliation, embarrassment and discomfort, I was visibly physically and emotionally ill.

35) I obtained the assistance of Oneto, an instructor of the DOT sexual harassment class.

36) Oneto spoke to Peckham and instructed him to take down the nude because it violated DOT policy because I was complaining about it. Peckham refused to remove the nude.

37) Peckham intimidated and threatened me that this was not the end of this, still refusing to take the nude down.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

38) I contacted DOT Employee Relations Bureau and spoke with Meade. I stated my complaint

and requested assistance to have the nude removed from the wall. I never received any help.

39) At some point Peckham finally took the nude down.

40) Many of the R8 employees who were in the hallways and witnessed these events became

angry with me and began to act hostile toward me. They would not return my hello, turned

their backs on me, talked about me behind my back, ignored me altogether.

41) The nude art and the hostile work environment interfered with my job performance.

42) On or about April 23, 2002 Ciferri, a co-worker and my walking partner for more than ten

years, out of nowhere started yelling at me saying that I had no right, I had no right to have

had the nude removed from the exhibit. Ciferri pointed her finger at me, pounded her finger

on her desk, said I should not be offended, the nude art was not against my religion.

43) This incident occurred at Ciferri's workstation located in a wide-open common area where

numerous R8 employees could hear her yelling in anger at me and some may have even seen

the incident from the hall.

44) I was shaken-up, I felt mortified, intimidated, humiliated, embarrassed, betrayed. I was

traumatized by Ciferri's hostile behavior which interfered with my job performance and

caused me to experience further PSD responses.

45) On information and belief, on or about April 24, 2002 Anderson distributed a memo entitled

'Cleaning Up Our Acts' in response to the disturbance that Ciferri created when she yelled in

anger at me, the hostile discussion that singled me out regarding the removal of the nude was

inappropriate to be openly discussed in rage in a professional office environment and made

many R8 employees feel uncomfortable and embarrassed.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

46) On April 23, 2002 I mailed an internal memo with a copy of the DOT sexual harassment policy to Peckham.

47) Shortly thereafter, Peckham reported the incident to Dennison, the Regional Director and sole authority regarding the R8 art shows. Peckham stated that he had determined that the nude was appropriate for inclusion in the exhibit, that I complained of being sexually harassed by the nude and requested that it be removed from the exhibit or I would place a sexual harassment complaint against him, and requested guidance for future submittals.

48) On April 26, 2002 Peckham sent an email to Dennison requesting a decision regarding the R8 art show "non-issue" and hoped that the decision would reflect what is best for the people as opposed to perceived government and/or political reactions.

49) On or about April 26, 2002 Peckham hung disturbing notices in and around where the nude had hung which stated "For employees who do not find the human body, displayed in the form of an artistic rendering, as offensive or disgusting, will appreciate Donna's work." The notices invited employees to view the nude in Dennison's conference room. I received a copy of this notice in my work mail.

50) I was shocked, I could not believe that Peckham plastered my confidential sexual harassment complaint all over the walls. I felt uncomfortable, intimidated, humiliated and overwhelmed.

51) These notices stimulated even more hostile discussion that singled me out, the anger and hostility towards me increased at work causing me further humiliation and discomfort and to become noticeably depressed. The notices, discussion and continued hostile work environment interfered with my work performance.

52) I attended business meetings in the Dennison's conference room on a regular schedule, which included some unscheduled meetings.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

53) I complained and asked that the notices be taken down and the nude removed from the art show. My requests were denied.

54) On May 1, 2002 I sent Peckham an email requesting a copy of all the information that was distributed in the region relating to the current art show. He forwarded my email to Dennison who instructed Peckham to ignore my request. Peckham never sent me the information.

55) Dennison and Peckham refused to give me the art show information so I could place my sexual harassment complaint in writing.

56) When Meade called to follow-up on my complaint, I told her that I was never consulted or included in any of the discussions and/or meetings regarding a resolution for my complaint, I was not comfortable with the wording, placement and distribution of the notices and the alternate location of the nude. Meade promised me that nudity would never be included in any future DOT art show.

57) On or about May 9, 2002 I was visibly physically and emotionally ill, working in a hostile work environment. I was depressed and overwhelmed and unable write and/or pursue filing a sexual harassment complaint.

58) To the best of my ability I followed DOT procedure, I immediately notified the individuals committing the sexual harassment that I objected and wanted it to stop.

59) I had attended R8 art shows for more than ten years, I could not have reasonably anticipated or expected that the 2002 DOT R8 art show would contain nude art.

60) On or about June 2002 Wessles spoke with me for having the nude removed and ended up yelling at me, stating I should not be offended. She also mentioned the incident with Ciferri and tried to force Ciferri's view on me. I was intimidated, embarrassed and humiliated.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

61) Dennison, Peckham, Patterson, Anderson, all R8 employees and Employee Relations were all notified and aware that I complained about the nudes in the 2002 art show and that I asked to have the nude taken down and I was as a result of my complaint.

**'Art Imitates Life?'' Article**

62) On or about, the Summer of 2002, DOT published and distributed a newsletter to every R8 employee that contained an article written by Peckham entitled 'Art Imitates Life?' which included a picture of Patterson, the artist of the nude, posed in front of the nude that I had complained of, the article singled me out, suggested that I should not be offended and invited others to openly discuss my confidential sexual harassment complaint.

63) R8 employees in regional buildings knew who the "one" person was, many of them witnessed the events and knew me by name.

64) During my assignment in R8 many employees throughout the seven counties came to know me because of my volunteer activities. I served as a solicitor for the United Way and was the Walk & Win Coordinator for the Employee Health and Safety program.

65) I was mortified, humiliated, embarrassed and uncomfortable knowing that this newsletter was distributed to all R8 employees, more than one thousand employees, that they may inquire as to the specifics, the "one" who objected to the nude, knowing that even more employees would be talking about me behind my back as a result.

66) Wessels, a co-worker in R8 Construction, Patterson is her best friend, enlarged the picture in the article to an eight and a half by eleven size, had Patterson sign it, and then hung it at her workstation in R8 which was located adjacent to mine and I had to routinely enter to conduct DOT business with her and/or her supervisor.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

67) Wessles has the enlarged copy of the signed picture hung at her workstation in Region 9 (R9) to promote what she claims is Patterson's sensational act to continue to harass me.

68) I shocked by Wessles actions to enlarge and hang the picture of the nude and the artist at her workstation. I am deeply disturbed that Wessels is continuing to discuss my confidential sexual harassment which singles me out, to promote and display the objectionable material to cause me further ongoing emotional pain and discomfort in retaliation for my sexual harassment complaint and having her best friend's nude art removed from exhibit.

69) Peckham and Patterson continued to sexually harass me by writing and photographing the nude art and having the article entitled 'Art Imitates Life?' and photograph published causing me to be even more embarrassed and humiliated and creating a more hostile work environment for me to work in.

70) The sole purpose of the article was an intentional and deliberate act by DOT, Peckham and Patterson to continue to sexually harass me, to rally other R8 employees to become angry causing me to endure further inappropriate offensive and sexual comments that created and made my work environment even more hostile to further cause me emotional harm.

71) DOT did not handle my sexual harassment complaint confidentially.

72) DOT did not provide protection for me against the retaliation of Peckham, Ciferri and the hostile work environment which is on going and permanent.

73) I was not given the same opportunity as Peckham and Patterson, to have my opinion and a picture of my choosing published and distributed to every DOT R8 employee regarding the nude art.

**Federal Highway Administration 2002 Excellence in Highway Design Awards**

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

74) On March 7, 2003 a luncheon was held to honor the recipients of the Federal Highway Administration 2002 Excellence in Highway Design Awards. R8 received four awards.

75) R8 Construction employees such as Ciferri received an invitation and attended the luncheon even though she did not directly work on any of the projects that received an award and had only worked in construction for about two years.

76) I was the only employee in R8 Construction that was not invited to this prestigious luncheon I had worked on the projects and I had worked in R8 Construction from more than nine years. I felt shunned, unwanted and uncomfortable during the many weeks of excitement leading up to and after this luncheon.

77) R8 construction did not send me an invitation, nor give me the opportunity to attend this very prestigious luncheon because I had the nude removed from the art show.

**DOT 2003 Art Show**

78) Prior to hanging the 2003 Art Show that contained two nudes in the building in which I reported to work, Dennison and Peckham discussed the sexual explicit nature of the nudes and the fact that I was almost certain to have a reaction to them, in fact they anticipated that I would have a reaction to them and discussed and planned how they would respond.

79) On or about April 18, 2003 at 1:45 pm Durham, a co-worker who also reported to work in the same building as I, informed Anderson, his supervisor which is also my supervisor, that he objected to the nudes that were part of the R8 art exhibit complaining that the nudes were not appropriate for the workplace and requested that Anderson take appropriate action.

80) On April 18, 2003 at approximately 3:30 pm while I was in route to the only women's restroom in the building where I reported to work, I saw a pornography nude that was hung

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

on the wall that jutted out, the nude was 'in my face.' I could not avoid it. The pornography

nude was even clearly visible and could not be avoided when exiting the women's restroom.

81) I was beside myself in disbelief and could barely function. I felt helpless, overwhelmed with

fear and humiliation. I was embarrassed, ashamed, and felt betrayed. This incident trigger my

PSD. I was visibly emotionally and physically upset and experiencing uncontrollable crying.

82) The pornography nude was entitled 'Reclining Nude' and was huge, the largest in the exhibit

and painted in true life-tone colors. The nude was created by the same artist, Patterson, who

submitted the 2002 nude which was referred to in the disturbing notices as the reclining nude.

83) The 2003 art show contain a second nude which was submitted by Peckham, the artist is his

wife Jane Peckham who submitted nude art for the first time.

84) On April 22, 2003 I reported the sexual harassment to Anderson, my supervisor, this was first

day he was in the office since the nudes were hung.

85) I told Anderson that Dennison, Peckham, and Patterson were continuing to sexually harass

me in retaliation for having the nude removed from the 2002 art show, that this year there

were two nudes prominently displayed in the hall on my route to the only women's restroom

in the building and that the nude submitted by Patterson was entitled 'Reclining Nude.'

Patterson submitted the 2002 nude which was referred to in the disturbing notices as the

reclining nude, that these actions were done intentionally to publicly ostracize me, to cause

me discomfort and humiliation because I complained last year and action was taken.

86) I asked Anderson for permission to report to work at an alternate location for the duration of

the exhibit. I stated that I did not want the nudes to be removed from the exhibit for fear of

further retaliation by other regional employees of whom were still acting hostile toward me

from having the 2002 nude removed from the exhibit. My requests were denied.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

87) I stated that I recognize and respected the artist's rights, the rights of all regional employees and the right to hang the nudes where people can come and go as they please, BUT the hallway is my assigned work place and I have no choice, the offensive pieces cannot be avoided and I am being forced to view objectionable material which is very up setting to me and interfering with my job performance. I was visibly physically and emotionally ill.

88) I told Anderson that I did not understand how Employee Relations Bureau allowed nude art to be included in the 2003 DOT R8 art show when the nude art in the 2002 DOT R8 art show was in violation of the DOT sexual harassment prevention policy and was removed.

89) I told Anderson that I had to relocate a meeting I had with a Federal Highway representative because I could not avoid the nude art in greeting or bringing the Federal Highway representative to the conference room where the meeting was scheduled to take place.

90) Anderson did not remain neutral when I complained to him, he repeatedly stated that he had no objection to the nude art, that he saw nothing wrong with the nudes. This made me feel very uncomfortable, was embarrassing and humiliating and further caused me to experience PSD responses.

91) On April 22, 2003 Anderson sent an email to Dennison informing him of the details of my sexual harassment complaint and stating that he would approve an alternate work location for me for the duration of the art exhibit. I never received an alternate work location.

92) On April 23, 2003 Dennison sent Anderson and Peckham an email, directing Peckham to take down the nudes and approved the same arrangement as last year. This email contained Anderson's April 22, 2003 email to Dennison. Trombini and  Mattice were cc'd.

93) Dennison, Anderson, Mattice and Trombini are all supervisors, they all knew and/or should have known that I would again become visibly physically and emotionally ill from the nude

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

art that was hung in my work environment in 2003  because of my reaction to the nude in the

2002 art show.

94) On April 23, 2003 I emailed my written sexual harassment complaint to Boardman and I

copied Anderson and Meade. I was not contacted and never received a reply from anyone in

response to this email.

95) The nudes were taken down and again disturbing, degrading hostile notices were plastered on

the walls in and around where the nudes had hung inviting employees to view them in

Dennison's conference room.

96) Had Anderson taken immediate action when Durham complained to I would never of been

exposed to the offensive art.

97) Anderson took no action regarding Durham's sexual harassment complaint because he

wanted me to be exposed to the nude art because I complaint about the nude in 2002.

98) My work-illness was one hundred percent preventable!

99) Had Anderson made some phone calls to have the nudes removed or to call me and warn me

so I could avoid them and I would not have ever been exposed to them

100)    Had Anderson immediately approved an alternate work location I would not have been

exposed to the nude art for more than five days after Durham complained and more than two

days since complained, I would not have experienced extreme physical and emotional

distress, embarrassment, humiliation and re-occurring PSD.

101)    DOT did not make a good faith effort to respond to my complaints in a timely manner.

102)    Anderson had access to employee emergency information and could have called me over

the weekend to arrange for an alternate work location OR he could have contacted Dennison

to have the nude art removed before Monday morning.


**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

103)    Peckham had again taken my confidential sexual harassment complaint and hung it up in
and around where the nude art had hung. These notices caused me an extreme amount of
emotional distress and discomfort.

104)    Dennison, Anderson and Peckham were all aware that hanging of the 2002 notices
created quite a stir in both regional buildings, how uncomfortable and unhappy they made me
feel and that I had requested them to be removed. They should have known that the same
would happen again as a result of hanging the 2003 notices.

105)    My work environment became increasingly hostile and stressful. R8 employees again
talked about me behind my back, blamed me for having the 2003 nudes remove from the
exhibit. The discussions singled me out. I was rejected, unwanted. I felt humiliated,
embarrassed and was noticeably depressed and very ill with PSD. The notices, discussion
and continued hostile work environment interfered with my work performance.

106)    Anderson never followed up with me regarding my complaint.

107)    On May 1, 2003 I mailed a restricted certified mail letter to Boardman that contained a
copy of the disturbing notice that was just hung up in and around where the nudes had hung
along with my April 23, 2006 email and letter and the four attachments that made up my
sexual harassment complaint. I mailed confidential copies to Anderson and Meade.

108)    On May 2, 2003 DOT R8 held a retirement party at the Holiday Inn to celebrate the
retirement of more than eighty R8 employees.  I was the only employee in R8 Construction
that was not seated with my program area. Instead, I was seated with consultant staff of
which I did not know very well.  This made me feel shunned.

109)    This was intentional and deliberately done in retaliation for my complaining that I was
offended by the nudes and for filing an internal sexual harassment complaint

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

110)   On May 5, 2003, more than eleven days since Meade received and opened my email containing my sexual harassment complaint, she called me to discuss it.

111)   Meade promised that the disturbing notices would be immediately taken down, that the nude art would be removed from Dennison's conference room and that the nude art would not be included in future art shows.

112)   The notices were not immediately taken down and remained hanging after the art exhibit was removed as a hostile reprimand. The nudes were not removed from the art show.

113)   On or about, May 14, 2003 Meade called to follow-up on my internal sexual harassment complaint.  I told her I was not satisfied and extremely upset and it was interfering with my job performance and that I wished to meet with Dennison's supervisor to discuss it.

114)   Employee Relations only agreed to meet with me because I insisted. I was still so upset and I did not want the sexual harassment to continue in the future. The meeting did not occurred until almost two months after the 2003 nude art was hung.

115)   On June 16, 2003 Durham and I met with Wright and Meade regarding my sexual harassment complaint, Dennison's supervisor was not in attendance. I hand delivered my complaint. I stated that I was a victim of deliberate repeated behavior of a sexual nature by Department employees, that the repeated behavior was premeditated and intentionally directed towards me.

116)   During the meeting Durham said that nudes conflicted with his duties and DOT policy in regard to enforcement for contractors, consultant and trainee staff, and the disadvantage, minority and women enterprises, he could not have clients walking past art of this nature in order to get to his office, this type of art is not allowed in construction project field offices.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

117)   Durham also stated that the nude were against the Department's Affirmative Action policy and that he personally objected to it, that he immediately informed his supervisor, Anderson as to his complaint and requested that he take appropriate action.

118)   Wright informed me that I sent my complaint to the wrong person, Boardman was not Dennison's supervisor Wells was.

119)   On June 19, 2003 I sent Wells my complaint by email. Wells never opened it. I was never afforded the opportunity to discuss my complaint with Dennison's supervisor.

120)   Instead, I received a phone message at my residence from Meade indicating that she was responding to my June 19, 2003 email to Wells and shortly thereafter I received a letter dated July 1, 2003 from Meade without further discussion.

121)   On or about July 1, 2003 Meade sent me a letter stating that the nude art was inappropriate in the atmosphere of workplace, that the R8 art show may not have been handled in the best or most sensitive way, that management was making ever effort to prevent future issues from occurring, that any regional art show will be subject to certain standards and will exclude nudity.

122)   This letter does not correctly summarize the meeting held with included my complaint and documentation regarding the 2002 and 2003 DOT R8 employee art shows, of the on-going sexual harassment and retaliation that I was experiencing.

123)   Wright and Meade never conducted impartial fact-finding interviews regarding my 2002 or 2003 sexaul harassment complaints and never even contacted Peckham.

124)   Meade did not keep her promise in 2002 and that nudes would not be included in any future DOT art shows because the very next art show included nude art and nudes are still being included in R8 art shows, on information and belief as recent as 2007.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

125)   On or about, February 2006 Oneto stated that the publication of the article and picture of Peckham and Patterson contradicts and is in violation of DOT sexual harassment policy which is meant to prevent conversation about sexual harassment that singles out one person, that the placement of the 2003 nude art in the same or similar place as the 2002 nude art is inconstant with DOT policy.

126)   Oneto also confirmed that the introduction into the workplace and the continuation of discussion as to whether or not that person has a right to be offended or why they should, or whether or not it should have been taken down, the discussion that singles out the individual is covered in the DOT sexual harassment prevention class as a hostile work environment.

127)   I only complained about the nudes when they were hung in the building in which I reported to work and Dennison's conference room because these locations were both part of my regular work environment where I performed my job duties and I could not avoid the nudes and I was forced to view nudes against my will.

128)   DOT never requested or inquired in at anytime, if I was a person with a disability despite that fact that I was visibly physically and emotionally.

129)   Employee Relations never investigated my sexual harassment complaint. Dennsion, Peckham, and Anderson were never contacted or questioned about my complaints regarding the nude art in the 2002 and 2003 R8 art shows.

130)   Employee Relations contacted Anderson only after I filed an external complaint with the New York State Division of Human.

131)   Meade did not keep my sexual harassment complaint confidential, did not provide a confidential meeting place in which to get the details of my complaint and did not send me a confidential response to my complaint.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

132)    Previous to the 2002 and 2003 art shows some R8 employees have had to take down art displayed in the form of post cards, posters, calendars, magazines that contained barely clothed women/men or nude women/men because it violated DOT sexual harassment policy.

133)    It is my belief that if these DOT employees working at locations other than the regional office buildings were allowed to attended the employee art show without having to charge time to accruals, the viewing of the art show would have been by a larger more diversified employee group that was more representative of the employees in R8.

134)    It is my belief that some or all of the employees who had received warnings and/or counseling memos regarding the removal of art that contained barely clothed women/men or nude women/men because it violated DOT sexual harassment policy would have also filed a sexual harassment complaint regarding the nude art in the 2002 and 2003 art shows.

135)    All the issues with the 2002 and 2003 art shows also caused my home environment to become hostile. My husband also works for R8, he did not want me to file a sexual harassment complaint for fear of retaliation against myself, and also against him, being my husband of which also did occur.

136)    On August 6, 2003 DOT responded to an employee complaint(s) for an issue that made the employee physically and emotionally unable to perform their work because of a Clorox smell in the building. Dennison and Trombini immediately approved alternate work locations for all building employees, more than one hundred employees, within one and half-hours from the beginning of the core workday.

137)    DOT routinely, as standard practice, immediately responds to employee complaints that make them physically and emotionally ill and interferes with their work performance.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

138)     Dennison and Trombini all were aware that I had asked for an alternate work location because of the nudes, they took no action to remove me from the offensive work environment as they had immediately responded when they approved an alternate work location for every R8 e employee who was affected by the Clorox smell.

139)     Dennison and Trombini did not immediately approve an alternate work location for me because they wished to retaliate against me for complaining of sexual harassment.

**Employment Issues**

140)     In November of 2003 I was legally separated from my husband. I was living alone apart from my son. My wages were my only source of income.

141)     From January 13, 2004 to December 15, 2004 I received Sick Leave at Half-Pay; from June 2004 to November 2006 I received Social Security disability benefits.

142)     On or about July 2003 I informed Anderson that I began medical for the sexual harassment and hostile work environment issues relating to the art shows.

143)     Anderson never helped me obtain medical treatment and never helped me complete the DOT accident report.

144)     Anderson was aware that I was receiving medical treatment beyond two treatments which required him to fill out a workers' compensation report for occupational disease workers' compensation form C-2. Anderson never filled out any workers' compensation form.

145)     Anderson never advised me of my rights and responsibilities regarding accident reporting, submission of medical documentation regarding workers' compensation benefits.

146)     Anderson never completed the required DOT illness report as he should have and never gave me an accident report to fill, he never sent me to personnel for help.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

147)   Anderson's position required him to be acutely aware of employee health and safety prevention and evaluation and was routinely reminded and was responsible to remind his staff of the required reporting and timely filing of all work accidents and illnesses.

148)   On or about the Summer of 2003 to December 2003 I made several requests for a transfer, asking to be removed from the hostile work environment. My requests were never granted.

149)   On December 16, 2003 after listening to my co-workers telling me that I should not be offended by what I determined to be sexual harassment and having being stressed about the same since April 2002, more than one and a half years, I again began experiencing uncontrollable crying and depression and called into work the next two days.

150)   On December 18, 2003 I reported my work illness to Workers' Compensation.

151)   On or about December 18, 2003 Totten completed the "Employers' Report of Work-related accident/Occupational Disease" form utilizing my report to the Call Center for Workers' Compensation word for word.

152)   The State Insurance Fund has no record of the "SAF-9, Supervisor's Report of Accident Investigation Personal Injury and Illness Report."

153)   DOT intentionally did not provide this paperwork and did not correctly complete the "Employers' Report of Work-related accident/Occupational Disease causing The State Insurance Fund to have no information on my illness so that my case would be controvert which effectively denied me all the benefits of employment and medical treatment to further cause me emotional and financial harm.

154)   I could have been on Worker's Compensation and worked for full time.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

155)    On December 19, 2003 I met with Anderson, turned in a doctor's note that stated I could

    work but I should avoid work that would require urgent or demanding decision making on

    my part.

156)    My work assignment only required urgent or demanding decision making on an

    infrequent basis and generally followed the timing of the construction letting program for

    projects that would have consultant staff assigned to the project where the consultant was not

    yet designated or was recently designated and may require an early start.

157)    In December 2003 there were no consultant agreement issues pending or would in the

    near future based on the regional consultant agreement schedule and the construction letting

    programs that would have required urgent or demanding decision making on my part.

158)    Anderson refused to let me work, he told me to go home and wait until I heard from him.

159)    When I did not here from Anderson in a few days I began to feel unwanted and that DOT

    did not care about me, I was living alone apart from my son and family and had no one to

    care for me.

160)    On or about January 6, 2004, more than sixteen days later, I received a letter from

    Anderson that contained the necessary paperwork for me to request a reasonable

    accommodation under the ADA.

161)    DOT as standard practice generally accommodates employees with requests of this nature

    without having to request a reasonable accommodation.

162)    There was no basis for having me request a reasonable accommodation, I could perform

    all the required duties of my position.  DOT did not request Civil Service to make a

    determination if I was unable to perform my job duties.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

163)    Anderson never completed the workers compensation illness report and never gave me

the DOT accident report to fill out effectively denying me the privilege of this benefit.

164)    Had Anderson completed the required paperwork the State Insurance Fund would have

had documentation that my illness rose out of and in the course of employment and my

workers' compensation claim would not have been controverted.

165)    On January 29, 2004 I received a letter dated January 13, 2004 from DOT informing me

that DOT is contesting my workers' compensation claim. This letter mentions my rights

under workers' compensation that did not apply to me at that time and may never apply to me

depending on the outcome of my claim which could take years to determine. This letter

caused my illness to become worse.

166)    Had my workers' compensation case not been controvert I would have been able to

participate in the Medical Evaluation Network I could have also participated in the

Mandatory Alternate Duty program and I would have been able to return to work. These

programs would have created a "win/win" situation for DOT and myself.

167)    On or about February 10, 2006 DOT's workers compensation representative and/or

employer witness Ciferri received, opened and used my mail/package sent to me from the

workers compensation board.

168)    My work illness was 100% preventable.

169)    On December 22, 2005, at the workers' compensation hearing Anderson continued to

sexually harass me by making it a point to clarify that he did not apologize for the nude art.

This made me feel very uncomfortable, embarrassed and humiliated.

170)    On December 16, 2003 Slomin placed me on involuntary Family and Medical Leave

(FMLA) before the three-day or more requirement had been met despite the fact that I

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

worked on December 16, 2003 and I could continue to work, DOT denied me active employment.

171)  . "SAF-9, Supervisor's Report of Accident Investigation Personal Injury and Illness Report" an the "Application for Sick Leave are required to be filled out when requesting FMLA. I did not fill out these forms or request FMLA because I could work

172)  DOT does not have the authority make any determination regarding an employees health condition, the DCS Employee Health Services has this authority.

173)  On or about May 27, 2004 and July 15, 2004 I received a canvass letters for a promotional CE1 positions of which I had to decline because of my work illness. I could not be considered for these positions.

174)  On or about October 29, 2004 I received a letter advising me that DOT proposed to terminate my employment under Section 73 and that I could request a hearing to dispute this. The hearing would be limited to answer if I been absent for one year due to a non-occupational disability and if I was medically unable to return to work and perform the duties of my position.

175)  I did not meet the requirements to request the hearing, I was not absent from work for one year and I was able to return to work and perform the duties of my position.

176)  On November 22, 2004 I advised DOT that I was able to return to work, requested an alternate work location as a reasonable accommodation, DOT advised me not to return to work

177)  On or about December 1, 2004 I received a letter from Trombini instructing me to provide documentation from my doctor as to why was I medically/psychologically not able

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

to work in R8. DOT continued to continue to sexual harass me demanding that I provide details of my disability as a condition to return to work.

178)    It is my belief that if I had not complained about the nude art, my co-workers would not have sexually harassed me, creating a hostile workplace and I would have been able to work in R8 as I had for more than thirteen years prior to.

179)    DCS Employee Health Services (EHS) conducts medical evaluations of current employees that have requested reasonable accommodations pursuant to ADA, which identifies whether the current employee is an individual with a disability and whether or not the accommodation requested is reasonable.

180)    DOT did not request EHS to conduct a medical evaluation.

181)    DOT never gave me the opportunity to report to work without the accommodation.

182)    I requested the appeal, on or about October 17, 2005 Swiers withdrew my appeal.

183)    Beginning on or about January 24, 2005, I contacted DCS and advised of all the details concerning the Section 73 termination and requested help in determining my rights, no action was taken for more than a year.

184)    Had DCS immediately taken action I would have never been terminated from NYS service.

185)    DOT and DCS never sent me any information such as bulletins, employment opportunities, training opportunities while I was out on leave.

186)    O'Connor forced me to contact DOT as a condition to remain on the preferred list.

187)    On February 14, 2005 I requested an employee reinstatement exam, Ciulla denied my request, I disputed this denial and was finally cleared to be reinstated on May 11, 2005.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

188)    I was placed on a preferred list for titles in the occupational field that I was terminated from, and I was placed on a re-employment roster for similar titles.

189)    On or about June 3, 2005 Trombini advised me that DOT would not be filling my position at this time due to budget restrictions, which is false.

190)    The Section 73 termination deprived me of employment as PET with all NYS department and/or agencies until DCS medically cleared me to return to work and prevented me from participating in promotional exams my name was removed from the promotional Civil Engineer 1 (CEI) list.

191)    On or about February 2005 I applied for NYS unemployment insurance benefits.

192)    To qualify for NYS Unemployment Insurance benefits, the claimant must look and apply for work within the scope of the last position held, I could not be lawfully appointed to ant PET vacancy until I was medically cleared by DCS.

193)    DOT did not give me written notice upon separation of my right to apply for NYS Unemployment Insurance benefits as required under Section 472.8.

194)    DOT reported that I was FIRED!

195)    Had DOT informed me of my right to apply for NYS Unemployment Insurance benefits under a Section 73 disability termination, I would have applied in December of 2004, immediately after receiving the termination letter, I then would have had enough qualifying income to receive benefits.

196)    On or about May 31, 2005 I applied to DCS for the 55b program, twice Reyes requested additional information that had already been submitted with my application.

197)    Finally on August 31, 2005 I received an eligibility letter for the 55-b program of which Swiers had attached a note for me to call him.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

198)   On September 9, 2005 I spoke with Swiers, he told me it would be best for all parties if I sought employment with a different state department or agency.

199)   On September 22, 2005 I wrote Hines requesting assistance in determining if I met the minimum qualifications for several titles, I never received a response.

200)   On September 23, 2005 I sent my resume for 55b employment opportunities consideration to DeSol and Morris for a CE1 position, or any other position for which I might qualify, I placed follow up calls, I was never contacted.

201)   On September 15, 2006 I asked Weiss to submit my resume that was on file under the 55b program for consideration for a CE1 vacancy, my request was denied.

202)   On information and belief, DOT made 55-b appointments for which I could have been appointed, I was never given equal opportunity to be considered for appointment.

203)   I was eligible for regular reinstatement to state service in any position in which I received a competitive appointment or was eligible to transfer to.

204)   From May 6, 2005 to September 10, 2006 I responded to vacancy postings by DCS, I made follow-up calls again expressing my interest in the positions, I was never contacted, interviewed, considered or selected for any of the positions.

205)   On December 24, 2005 I applied for a promotional examination for a Transportation Contract Analyst II, Smith and Sisario would not extend me eligibility.

206)   On or about February 28, 2006 O'Connor forced me return canvass letters to DOT R8 indicating that I was declining due to the travel requirement.

207)   On February 17, 2006 Morris emailed O'Connor stating that DOT did not contacted me about employment opportunities claiming it was not in the best interest of the State to reinstate me.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

208)   Morris outright lie because I had filed a complaint with the NYS Division of Human

Rights.

209)   Cross mislead me regarding my reemployment rights.

210)   On or about from December 16, 2003 through June 15, 2006 DOT made more than one

hundred (100) appointments for which I could have/should have been appointed, transferred

to, or reinstated, and for which I had applied.

211)   On June 6, 2006 Morris appointed Stephanie Lynn Winelhake via a 70.1 transfer to a

PET position, the title that I was on the preferred list for, I did not receive reinstatement until

June 15, 2006.

212)   Morris manipulated my reinstatement appointment placing me in a position where I

would be assigned "out of title" work.

213)   On April 28, 2006 I interviewed for a SET position, on June 5, 2006 I was notified that I

was selected, Morris intentionally held up the notification of this selection.

214)   On November 9, 2006 Crachi and Morris would not consider me for a Transportation

Contract Analyst II position even though the duties were nearly identical to the duties that I

had performed at the time DOT terminated my employment.

215)   Aiello and Dearstyne never made the DOT records that I requested under the Freedom of

Information Law available to me.

216)   DiLella and Hennessey gave misleading and false information to the NYS Division of

Human Rights during the investigation.

217)   It is very emotionally upsetting to me to have to bring this action before a court of law.

218)   I have attended DOT art shows for more than ten years, I could not have reasonably

anticipated or expected that the 2002 Art Show would contain a nude.


**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

219)   If I had not complained about the nude art, they would not have sexually harassed me, creating a hostile workplace that interfered with my job performance and I would have been able to work as I had for more than thirteen years prior to.

220)   If I was not denied an accommodation for my disability I would have been able to work and NYS constructively terminated my employment denying me equal terms and conditions and privileges of employment because of disability and sex.

221)   DOT employees who were assigned to a different program area, or to a different region/MO location and were commonly referred to as "Miss-Assigned."

222)   From October 25, 1990 to June 30, 1993 I was required to ensure that timesheets were received from R8 employees who were miss-assigned and reported to work outside of R8.

223)   DOT routinely had, and has, employees working outside of R8 on R8's payroll as standard practice, and is general knowledge to DOT employees, the public, and is also the case for the MO and other regions.

224)   On or about May 2000, the R8 Construction organization chart indicated that fourteen employees were miss-assigned to other program areas, and that several employees from other program areas were miss-assigned to Construction.

225)   On or about July 2000, the R8 Design organization chart indicated that more than twenty-four employees were either miss-assigned to other program areas, or from other program areas, or to another region.

226)   DOT did not provide me with the necessary paperwork to request a reasonable accommodation in a reasonable amount of time

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

THIRD AMENDED COMPLAINT - ATTACHMENT #1

227)    DOT is not qualified to make any determination regarding my health condition and should not have placed me on FMLA without consulting DCS. DOT denied me active employment in retaliation for filing a sexual harassment complaint

228)    DOT did not make any effort to keep my medical condition/illness confidential. This letter is not marked confidential and was place in my personal history jacket and circulated openly to other program areas in R8.

229)    Confidential medical records are not allowed to be placed in employees' personal history jackets or circulated.

230)    My November 19, 2004 medical certification medically cleared me to return to work and did not put any restriction on the job duties or tasks that I could perform. I was able to perform all the duties of my positions from a remote location so granting my request would not create an undue hardship for DOT.

231)    Allowing me to perform my R8 duties from a remote location would be allowing me to return to work and perform my work as I have done so for more than five years.

232)    On December 8, 2004 I gave DOT a from my doctor that indicated the request to change work location should be considered permanent. This letter did not indicate that I should avoid permanently any work conditions that would endanger my medical and emotional well-being, specifically the emotional stresses that I reported of sexual harassment and misconduct in R8.

233)    Anderson always remotely supervised me and I communicated remotely in all aspects of my job duties with the area supervisors, DOT employees, and consultant staff.

234)    On or about July 2004 until on or about October 2005 Durham was supervised remotely.

235)    On or about June or July of 2006 Richard Hyde, a new DOT employee, was and is currently being remotely supervised by Chuck Lambert. Richard Hyde reports to 50 Wolf Road and his supervisor reports to work on the State Campus Building #18.

236)    DOT did not give me equal terms and conditions of employment of working remotely, as routinely done as standard practice for other DOT employees.

237)    DOT routinely had 'Miss-Assigned' employees between the MO and regional offices. I could have worked in the MO while having a R8 line number.

238)    On December 8, 2004 during the meeting with the Reasonable Accommodation Committee Trombini denied my request to have my supervisor, Mattice, who I just found out was my supervisor and whom I have never worked for, be in attendance.

239)    Trombini denied my request to have the Reasonable Accommodation Committee contact Anderson, the supervisor that I had actually worked for, for input of why I could perform my R8 duties remotely, and the fact that I had been working remotely for many years.

240)    Due to the nature of my illness it was best for me to return to work and perform work that was familiar to me.

241)    An alternate reporting location would have eliminated the hostile work environment in R8.

242)    On December 8, 2004 I stated to the Reasonable Accommodation Committee that I was able to perform all the required duties of my position with no restriction. The closest alternative location outside of R8 from my home was Albany. MO Construction was the most appropriate alternative location that would provide the necessary resources for me to perform the duties of my position without disrupting Department objuctives.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

243)  The part-time restriction indicated by my doctor for my return to work was only for me to acclimate back to work. I stated to the Committee that it was estimated to be necessary for only two weeks and that there was not reason to believe that it would be for longer.

244)  I never refused any job offer. DOT never offered me a job and never let me report to work without the alternate work location which was the only permanent restriction and would no have pose an undue hardship for DOT.

245)  On December 16, 2004 I received a letter from Trombini advising me that my request for an alternate work location was denied  because of supervision and communication hardships and I was further advised that I was terminated under Section 73, before the one year requirement was met.

246)  The Section 73 termination deprived me employment as a PET with all NYS agencies until DCS medically cleared me to return to work and also prevented me from participating in promotional exams, and my name was removed from the promotional CE1 list.

247)  In addition, as I had a "two year bar" restriction that I could not appear or practice DOT for two years which did not allow me to work in my occupational field to obtain work.

248)  On December 20, 2004 DOT received my request for the review process.

249)  The enclosed Request for Reasonable Accommodation form had been signed by Mattice on December 13, 2004 and indicated that no decision had been made at that time and indicated that DOT would continue to review my request and the agency person responsible for reasonable accommodations would contact me within a week.

250)  This person never contacted me and was never named to me, so I was wholly incapable of contacting this person.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

251)    On or about December 21, 2004 DOT R8 sent my Reasonable Accommodation Review request to Weiss. I have not received confirmation from DOT that my review was ever sent to DCS. I do not know what information was sent to CS. I have never had the opportunity to comment on its accuracy, content, and or provide supplemental information.

252)    On or about May 31, 2005 I sent an application to DCS for consideration for the 55b program, the Governor's Program to hire persons with disabilities.

253)    On June 16, 2005 I sent DOT a letter inquiring as to the status of my December 17, 2003 request for the external review process in regard to my Request for a Reasonable Accommodation.

254)    On December 17, 2004 I mailed a letter to Trombini with Section F, Authorization for External Review by Compliance Review Board completed on the Reasonable Accommodation form. Such a review would be done by the Compliance Review Board, which is an advisory body consisting of the President of the Civil Service Commission, the State Advocate for Persons with Disabilities and the Director of the Governor's Office of Employee Relations. The external review process is estimated to take approximately twelve weeks after the request is received by the Department of Civil Service.  Within two weeks after the Compliance Review Board renders its opinion, the agency head must inform me in writing, of the final determination with a copy of the Board's recommendation.

255)    On December 22, 2004 I received a copy of Trombini's memo to Weiss in regards to my appeal indicating that my appeal would be submitted in a timely fashion. My appeal was not reviewed in a timely fashion and was eventually withdrawn without my consent.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

256)    On June 24, 2005 I called CS regarding the status of my application and on June 25, 2005 I sent supplemental medical documentation that explained how my impairments limit my major life activities.

257)    On or about June 29, 2005 I received a letter from Swiers indicating that additional information on how my disability interferes with employment and the limitations placed on major life activities was needed to properly assess my 55b application.

258)    On or about July 6, 2005 I received a letter from DOT advising me that my Reasonable Accommodation was still under review.

259)    On or about July 11, 2005 I called DCS regarding the additional documentation that I had mailed in for my 55b application. DCS told me that they had no record of receiving it. On or about July 11, 2005 I sent another copy of my June 25, 2005 letter.

260)    On or about July 26, 2005 I again received a letter from Swiers of CS indicating that additional information on how my disability interferes with employment and the limitations placed on major life activities was needed to properly assess my 55b application.

261)    On or about August 12, 2005 I sent a letter to DCS stating that I had already sent in all the require documentation that answered all the questions.

262)    On or about August 31, 2005 I received letter for Swiers  indicating my eligibility for a 55b appointment effective August 31, 2005.

263)    On September 9, 2005 I spoke with Swiers  who had attached a note to my letter of eligibility for 55b, he had reviewed my 55b eligibility and  reviewed my Reasonable Accommodation Appeal.

264)    Swiers asked how long I had worked for the DOT.  He stated that it would be best for all parties if I sought employment with a different employer and got a fresh start.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

265)   In reply, I replied that I had no problem working for the DOT as long as it was not in R8, I also stated that I am ready and able to report to work immediately should a reasonable accommodation resolution be reached.

266)   Swiers told me that Hines of his office would help in trying to get a 55b appointment to a level at, or near, the level for the title that I held at the time the DOT terminated my employment.

267)   On or about October 17, 2005 I received a copy of a letter from Swiers sent to Weiss indicating that my Reasonable Accommodations Appeal was withdrawn, and stating my 55B eligibility and that should I seek employment or re-employment with DOT that my application should be fairly and respectfully considered.

268)   Swiers included a note to me that under the 55b eligibility I was not guaranteed employment but that he assured me that the 55b office would help.

269)   I was alarmed when I received this letter from Swiers. I did not withdraw my Reasonable Accommodation Appeal.  On October 19, 2005 I immediately sent a letter to Swiers and the Compliance Review Board and asked that the review process be continued. I indicted that I was ready and able to report to work immediately should a reasonable accommodation resolution be reached with my former employer.

270)   On or about November 14, 2005 I received a letter from Swiers that the review of my appeal could not be continued because of the amount of time that had lapsed. Swiers then went on to tell me quite frankly that the New York State Division of Human Rights most likely would not take my case that my only course of action was to work with the 55b office.

271)   I was shocked. I reread this letter and was in total disbelief. I can not understand how Swiers could approve my 55b application and also review and deny my reasonable

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

accommodation appeal. That is a conflict of interest. My reasonable accommodation appeal

was supposed to be reviewed by the Compliance Board.

272)    Swiers cannot make decisions for me or act on my behalf. Swiers had no right to approve

my 55b eligibility in exchange for, or as a condition of not having my Reasonable

Accommodations Appeal reviewed.

273)    A doctor or other professional, who conducts or reviews medical records in determining

whether or not it is possible to make a reasonable accommodation should not also be

responsible for making employment decisions.

274)    If Swiers did not withdraw my reasonable accommodation appeal I would have been able

to return to work much sooner than June of 2006.  I was denied employment with DOT

because of my disability.

275)    It is also my belief that if I were not denied a reasonable accommodation for my

disability, I would have been able to work  without interruption and that DOT constructively

terminated my employment.

276)    On or about January 19, 2005 through April 7, 2005 DOT posted vacancy

announcements, more than three vacancies for PET positions in the MO and R1, for which I

applied, for which DOT or DCS could have transferred me to or proposed as a resolution for

my reasonable accommodation request and or appeal. I was not otherwise eligible to be

considered for these vacancies because of the Section 73 termination.

277)    The Section 73 prevented me from being reinstated to any PET position in NYS service

with any department or agency until I received medical clearance from DCS.

278)    On January 25, 2005 under the direction of DCS I mailed a letter to DOT requesting

reinstatement and asked to be considered for the PET vacancy in the MO. AS per DCS DOT

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

had the authority to correct and or reverse the Section 73 termination which would have also provided a resolution to my reasonable accommodation request and or appeal without any undue hardship on the DOT.

279)   I never received a response from DOT so on February 4, 2005 I sent my expression of interest for this position to Mr. Wilder.

280)   On February 4, 2005 I sent my expression of interest to DOT in the MO for the PET position. I was contacted to set up an interview, Mr. Wilder needed to check with personnel first and said that he would get back to me. I was never re-contacted or considered for this position.

281)   On February 5, 2005 I mailed a letter to DCS to confirm my conversations of January 24, 2005 regarding the PET vacancy, the promotional CE1 list, my medical certification to return to work, and reinstatement issues requesting help.

282)   On February 9, 2005 I drove to DCS in Albany to meet with someone who could help me. I hand delivered a copy of my February 5, 2005 letter to Wallace and asked for help.

283)   On or about February 15, 2005 I mailed a letter to Wallace that augmented my letter of February 5, 2005. I provided copies of all the correspondence with DOT so my employment issues could get resolved and I could return to work. I also wrote two additional letters requesting reemployment help in February and March of 2005.

284)   On or about February 16, 2005 I mailed DSC a letter that was an addendum to my February 15, 2005 letter indicating that I did not have the opportunity to explore other alternatives and DOT never gave me the opportunity to report to work without the Reasonable Accommodation.


**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

285)   DSC has the responsibility to help individuals seeking reinstatement to state service and to provide specific information on benefits.

286)   On or about February 2005 I applied for NYS unemployment insurance benefits. In order to receive benefits the claimant must look for suitable work for which you are fitted by training and experience.  My last work assignment included Transportation Contract Analyst (TCA) duties and I was required to look and apply for work in this title and or occupation.

287)   On or about spring of 2005 DOT reported to the NYS Unemployment Insurance office that I was FIRED! I could not believe this!

288)   The NYS Unemployment Insurance office and the NYS Employment offices within the NYS Department of Labor are department and agencies that I was seeking reemployment to state service.

289)   These department and agencies have on record that I was fired. Thousands of people take civil service exams and are on lists for civil service job opportunities. Why would any department or agency ever need to consider an applicant that was FIRED!

290)   It is my belief that DOT intentionally indicated I was FIRED to prevent me from collecting unemployment insurance benefits, and intentionally ruined my chances to be considered for reinstatement to state service at these department and agencies, and ruined my character in retaliation for filing a sexual harassment complaint with the NYS Division of Human Rights.

291)   During my employment with DOT in the CC1 title I received four commendations; in the SET title I was nominated by my supervisor and honored during Women's History Recognition month, and received an award for my participation in the Consultant/Contractor Force Account Forum; as a PET I was recommended by my supervisor and selected as a

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

Subject Matter Expert for the Re-Engineering Process for Contracting and Contract Management for Consultants.

292)    I have received letters of references that confirm my work ethic and job performance to be of a high standard. I was NOT FIRED!

293)    Anderson or DOT never sent me any information such as bulletins or employment opportunities while I was out on leave.

294)    DOT or DCS never sent me any information such as bulletins or employment opportunities or other benefit information such as tuition reimbursement programs after I was medically cleared to return to work or at any time.

295)    On February 14, 2005 I sent a letter to DCS requesting an employee health service reinstatement exam.

296)    On or about February 22, 2005 DCS denied my request for the reinstatement exam, in response I mailed the letter that Trombini sent to me stating the Section 73 termination did not require me to be reinstated solely to my former position with my former employer at the location where I last reported and requested that my Reinstatement Medical Examine Request be scheduled.

297)    On or about May 11, 2005, almost three months after I requested the reinstatement exam, I received a letter from DCS that I was medically cleared me to return to work with NYS and that I was eligible for preferred list and reemployment roster employment opportunities.

298)    NYS agency/departments personnel offices can access the NYSTEP database with an individual's social security number which provides the individuals employment history such as the current or last know agency, positions held, location etc.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

299)    On or about December 26, 2006 DCS informed me that state personnel offices should

only be able to access an employee file using a social security number after an agency has

made an offer of employment. Every state application requires the applicant to provide their

social security number at the time of application in order to perform the necessary back

round checks.

300)    My employment history that personnel offices can access the NYSTEP database shows

the Section 73 termination but does not contain any information that I was medically cleared

to be reinstated to state service.

301)    I had responded to many NYS employment, several personnel offices called me and

stated that in order to consider my letter of interest that they needed my social security

number to verify that I had prior state service.

302)    It is my belief that I was never reconnected by any of these personnel offices because my

employment history indicated that I was just terminated from state service under Section 73.

With thousands of individuals on civil service lists why would any personnel office need to

consider an individual that was just terminated from state service under Section 73.

303)    It is my belief that I was not re-contacted by these personnel offices because DCS did not

indicate that I was medically cleared to return to state service in my employment history, I

was not given equal opportunity for employment or re-employment because of this omission.

304)    DOT never told me or gave me the opportunity to report to work without the reasonable

accommodation.

305)    On March 11, 2005 I filed a complaint with the State of New York, Division of Human

Rights against the DOT, DCS, and the State of New York Department of Audit and Control.

306)    On or about March 17, 2005 I mailed my resume for a job posting in DOT Region 1.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

307)   On or about May 11, 2005 I received a letter of reference from DOT that contained false information regarding my NYS employment history. I had to request corrections several times, I did not receive a fully correct letter until August 16, 2005, after more than three months.

308)   I needed this letter in applying for work. DOT did this to further harass me for complaining about the nude art.

309)   On or around May 11, 2005 I was placed on a preferred list for hiring under Section 73 Reinstatement to NYS with the DOT as a PET, as of August 31, 2005 I was eligible to be hired under the 55-b program I was also eligible for regular reinstatement beginning December 15, 2004.

310)   This regular reinstatement eligibility was eligibility to be reinstated to state service in any position of which I formerly held or was eligible to transfer to with the exception of the PET title which I held at the time the DOT choose to terminate my employment under Section 73.

311)   On or about May 5, 2006 I received a letter from the DCS Career Mobility Office (CM) which stated that I was entitled to preferred reemployment under Section 73 in counties outside of the DOT, R8, my former region.  Under the NYS reemployment system, a department or agency must hire the eligible candidate ranked highest on the preferred list when filling vacancies.

312)   CM monitors issues relating to the preferred list and reemployment roster and all employment and reemployment issues relating to NYS service.

313)   On or about May 15, 2005 I mailed a letter to DOT MO requesting reinstatement to my former title under Section 73.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

314)   On or about May 18, 2005 DOT MO mailed me a letter advising me that I was only

eligible for reinstatement to positions in R8, that my former agency was DOT R8.  This letter

never mentions R8 as a lay off unit. DOT R8 was copied on this letter. I never heard of DOT

R8 being qualified as an agency, my employer was DOT, I was eligible for promotional civil

service tests with my agency, the DOT.

315)   I have never seen a promotional civil service test for DOT R8. Never!  If this was the

case that my former employer was DOT R8 then EHS would not have been able to medically

clear me to return to work ever for the rest of my life. I could never be employed in a PET

title with any state department or agency without being medically cleared by CS EHS due to

the section 73 termination for the rest of my life.

316)   This would mean that I could never freely choose to work in any other department or

agency and that I would be mandated to work only in DOT R8. This would be against my

right to freely seek reinstatement to state service in the counties that I freely chose.

317)   Under Section 73 it is up to the individual to seek and request reinstatement which is a

free choice and not required under any law rule or regulation.

318)   On or about May 18, 2005 CM sent a letter to DOT confirming that I, a former employee

of DOT was cleared to return to state employment and that I must be reinstated in accordance

with Section 73, and if I could not be reinstated to my former position or a position in a lower

grade in the same occupational filed, or if the workload did not warrant it that I would be

placed on a preferred list for this agency only and that I should fill out the Preferred

List/Reemployment Roster Eligible Card indicating the counties that my agency has offices

and of which I would like to work.

319)   This letter did not restrict my reemployment rights to R8.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

320)   On or around June 3, 2005 I received a letter from Trombini confirming that I was cleared to return to NYS employment under Section 73 and confirming that I was entitled to be reinstated in my former position, a similar position, or a lower grade position in the same occupational field.

321)   The letter also informed me that my name would be placed on the preferred list for the entire DOT and requested I return the enclosed Preferred List/Reemployment Roster Eligible card indicating the counties in which I would like to work. I was in agreement with this letter in which DOT R8 correctly stated my reemployment rights under Section 73 as I and CS CM knew them to be. The employee section of the instructions on the Green Card indicated that I should check those counties where I would be willing to work and that I may add counties later.

322)   On or about June 3, 2005 DOT sent me a letter that I was medically cleared to return to work and DOT would not be filling my position at this time due to budget restrictions.

323)   DOT was required to reinstate me at this time unless the workload did not warrant it. DOT refused to reinstate me to my former position, or a position in a lower grade in the same occupational field in retaliation for filing a complaint with the NYS Division of Human Rights causing me financial harm.

324)   On or about June 8, 2005 CM sent me a list of titles that I was eligible to be on a Preferred List for and list of titles that I would be on a Reemployment Roster for reinstatement to state service.

325)   I was to be on a Preferred List for the Engineering Aid, ET, SET and PET titles. I was also to be on a Reemployment Roster for Assistant Land Surveyor 1, 2 and 3, Drafting Aide,

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

Drafting Assistant, Drafting Technician, Environmental Engineering Technician 1 and 2,

PET Soils and SET Soils titles.

326)   My reemployment rights under Section 73 included being reinstated in counties outside

of my last county of employment, which Dutchess County.  Under Section 73 I was on a

preferred list from which I was to be mandatory hired as a PET, a like position, or a lower

position in my occupational field at the DOT when such a position was to be filled.

327)   I was entitled to be on a preferred list and a reemployment roster for reinstatement to

state service once EHS medically cleared me to return to work.

328)   On or about June 13, 2005 I supplied DOT with my completed Preferred

List/Reemployment Roster Eligible Card indicating Albany and Greene Counties as counties

that I was available for reemployment. I indicated that I was available for both full time and

temporary work assignments.

329)   On June 16, 2005 I sent a letter to Trombini inquiring as to the status of my Reasonable

Accommodation Appeal.

330)   From the time I was on the preferred list under Section 73, eligible for a 55b

appointment, and eligible for a regular reinstatement until June 2006, I was never selected for

a PET position, like position, or lower position in my occupational field or position that I

formerly held or was eligible to transfer to despite the fact that I applied for several open

positions and there were several open positions for which I should have been mandatorily

selected.

331)   Instead, on information and belief, these positions went to individuals who were not as

highly ranked as I, not on a preferred list, not on as high a preferred list as I, or not as

qualified as I.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

332)   Despite the fact that, as a result of being on the preferred list, I was supposed to receive preferred list canvass letters for engineering technician series vacancies that were filled by the DOT for work in counties that I had indicated that I was available for reemployment under the state reemployment system, I did not receive any preferred list canvass letters for any reemployment opportunities outside of R8, Dutchess County - the county in which the DOT knew I would not be able for work.

333)   On or about September 2005 a National Certified Career Counselor at the NYS Department of Labor employment office said that I must apply for work in the job titles based on my transferable skills and accomplishments identified while working on my resume.

334)   On September 22, 2005 I mailed Hines a letter requesting assistance in determining if I meet the minimum qualifications as per the DCS for the Contract Management Specialist 1 and the Transportation Contracts Analyst 1 titles. I never received a determination.

335)   Hines sent me listings of state agencies that had vacant positions for the entry-level CE1 title. As of September 12, 2005 DOT MO in Albany had sixty-one (61) vacant CE1 titles and DOT R8 in Poughkeepsie had fifty-three (53) vacant CE1 titles.

336)   State agencies and or departments may convert any entry-level, such as the CE1 title that is filled via an open-competitive civil service examination to a non-competitive 55b position. The Division of the Budget permits agencies to fill positions under a hiring freeze with qualified 55b appointments provided the agency can fund the position and it is within personnel levels.

337)   On or about September 23, 2005 I mailed DOT MO and R1 my expression of interest for work for a CE1 position, or any other position that I may qualify for in the agency. On

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

September 28th and 29th I placed follow-up calls and spoke directly with Janice Morris and Ron Weiss of the MO, and Lou DeSol of R1.

338)   DOT routinely had, and has, employees working outside of R8 on R8's payroll as standard practice, and is general knowledge to DOT employees, and the public, and is also the case for the MO and other regions.

339)   DOT could have appointed me through the 55b program to any of the vacant entry-level positions statewide such as for the Albany and Poughkeepsie locations and had me report to a location that was outside of R8 and was within the counties that I had indicated that I was available for work as is routinely done for other DOT employees as standard practice.

340)   DCS is a state agency/department to which I could have been reinstated.

341)   On May 6, 2005 I sent my expression of interest to DCS Information Resource Management Application Support Unit for a C1 vacancy; from September 10, 2006 through September 21, 2006 I sent my resume stating my experience and my eligibility for reinstatement to DCS Testing Services Division Rating Unit for one C1 position, to the Testing Services Division Arrangements Unit for two C1 positions, to the Administration Division Office of Human Resources Management for one C1 position.

342)   I called to verify if my letters were received and again expressed interest in the positions. I was never contacted, interviewed, considered or selected for any of the positions.

343)   DCS did not contact, interview, consider or select me for these positions was in retaliation for having filed a human rights for the NYS Division of Human Rights.

344)   Despite the fact that I expressed interest on September 23, 2005 in a grade 6 position (a clerical title) under 55b eligibility, DOT told me that I would not be considered for the position because I was overqualified.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

345)   DOT denied reemployment to me because the DOT wished to retaliate against me for filing a complaint with the NYS Division of Human Rights on March 11, 2005. Under 55b I was eligible to be put into any entry-level position - such as this position - for which I was qualified, which I formerly held at the DOT and for which I was also regular reinstatement eligible.

346)   On September 23, 2005 I sent my EOI for employment opportunities along with my eligibility letter for a 55b appointment to DOT in R1 and MO regarding employment opportunities for a CE1 position, or any other position for which I might qualify.

347)   I was never contacted for any position under the 55b program.  I was never contacted, or considered for any of the CE1 employment opportunities, or any other position for which I was qualified, posted by the DOT after my EOI was received and was on file for employment opportunities. I was not selected for these positions and received no response.

348)   I was never contacted, interviewed, considered or selected for any position under 55b eligibility. I was never contacted, interviewed, considered or selected for any of the CE1 employment opportunities, or any other position for which I was qualified which was posted by the DOT, even though my letters had been received by DOT and was on file for employment opportunities.

349)   The DOT knew that I had taken the CE1 exam and was on the promotional list.  DOT had removed my name from the promotional CE1 list on December 15, 2004 when they terminated my NYS employment under Section 73.

350)   Section 73 termination also disallowed me from taking the promotional CE1 exam held in January 2005.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

351)    On September 28, 2005 I called DeSol, he stated that CE1 vacancies were only filled by
        Civil Service lists which is false. The CE1 title is an entry level position and eligible for 55b
        appointment. The Division of Budget permits agencies to fill positions under a hiring freeze
        if the agency can fund the position within approved funding and personnel levels.

352)    DeSol stated that the DOT would be filling many engineering technician series titles
        before the end of 2005 and at the beginning of 2006.  I requested to be considered for any
        other position that I qualified for including entry level clerical positions, but was never
        contacted for any employment opportunities.

353)    On October 17, 2005 Swiers withdrew my Reasonable Accommodation Appeal without
        just cause.  This action was in retaliation and was financially and emotionally devastating.  I
        could report to work and would have immediately reported to work when a Reasonable
        Accommodation had been reached. There were several open positions at the time that would
        have constituted reasonable accommodations.

354)    On or about October 19, 2005 I sent Swiers a letter informing him that I have NOT
        withdrawn my Reasonable Accommodation Appeal and to continue the review process, that I
        was unemployed and ready and able to report to work should a resolution be reached with my
        former employer.

355)    On or about November 14, 2005 I received a letter from Swiers, cannot continue the
        review process of my reasonable accommodation appeal, my termination from DOT had long
        since precluded and avenue for reversing the denial of my request.

356)    The review was to be done by the Compliance Review Board.  The external review
        process is estimated to take approximately twelve weeks after the request is received by
        DCS.  Swiers is part of the Board - he cannot act or make decisions for me.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

357)   On November 21, 2005 I faxed my expression of interest (EOI) for a CC1 (one vacancy) and C1 (two vacancies) positions in response to vacancy announcements posted by the DOT on November 17, 2005.  I was qualified for these positions and was eligible for regular reinstatement to these positions.

358)   On November 13, 2005 I called DOT and spoke directly with Donna Cervini to follow-up on my expression of interest. I was not contacted, interviewed, considered or selected for any of theses positions although I was the best qualified candidate.

359)   I had been employed in a CC1 position with DOT in the past and received four commendations for my work. On or about January 11, 2006 I received a letter from DOT telling me that I was not selected for any of these positions.

360)   On December 24, 2005 I applied for a promotional examination for a TCA2 title. I was eligible to take this exam because I was on the preferred list. DCS informed me that my application was denied because I did not serve in the qualifying title. I believed that I was eligible because my employer, DOT developed my performance program and I had more than five yeas of experience. DOT even selected me as a Subject Matter Expert for the Re-Engineering Process for Contracting and Contract Management for Consultants. DCS decided not to extend eligibility for related or collateral titles for.

361)   On information and belief there are only two departments/agencies that have TCA2 positions. As of September 11, 2006 there were eleven (11) TCA2 positions statewide, DOT had nine (9) of them. I liked the work that I performed in R8 at the time DOT terminated my employment. DOT recognized my abilities and selected me as a Subject Matter Expert for the Re-Engineering Process for Contracting and Contract Management for Consultants. I believe that I would be one of the most qualified applicants to fill a promotional position.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

DCS decided not to extend me eligibility to take the promotional exam because I filed a complaint with the New York State Division of Human Rights.

362)    On November 9, 2006 I sent my expression of interest for a TCA2 vacancy in the DOT Office of Construction and I sent a copy of my letter of interest to Personnel asking that I be considered for the vacancy via "Miss-Assignment." I attached to my letters a copy of my resume and three letters of reference that specifically confirmed recommended me for the work of the vacant position. I performed the exact duties in R8 at the time DOT terminated my employment. On November 11, 2006 I received notification from DOT was not interested in considering my expression of interest for this vacancy.

363)    DOT recognized my abilities and selected me as a Subject Matter Expert for the Re-Engineering Process for Contracting and Contract Management for Consultants. I believe that I would be one of the most qualified applicants to fill the TCA2 position. The duties on the vacancy announcement were identical to the duties that I had performed in R8 for more than five years. DOT did not consider me for this vacancy because I filed internal and external complaint with the New York State Division of Human Rights.

364)    From July 2005 through May 2006 I obtained work through temporary staffing agencies.

365)    As of January 12, 2006 there were engineering technician series vacancy postings in the DOT for work in a county in which I indicated that I was available to work.  I received no notice of these vacancies and no preferred list canvass letters for these vacancies that were filled by DOT, as I should have under Section 73.  In addition, I should have been selected for these vacancies because I was the only candidate on the preferred list and the highest candidate on the preferred list. I asked DCS for help.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

366)    On or about January 26, 2006 DOT left a voice message on my answering for positions in

R8 that did not have Dutchess County as a county of employment.

367)    On or about February 1, 2006 DCS informed me that I was disqualified from the TCA2

exam because I did not serve in the permanent competitive qualifying title despite the fact

that the DOT developed my Performance Program for the PET title that included the

qualifying duties. This meant that CS and DOT knowingly had employed in "out-of-title"

work.

368)    On or about February 10, 2006 DOT's workers compensation representative and/or

employer witness Ciferri received my mail/package from the workers compensation board. I

paid a fee of $167.00 for this mail. My mail was not returned to the workers compensation

board or forwarded to me even though both parties were cognizant of who I was and what

my address was.

369)    My mail was opened by DOT's workers compensation representative and/or employer

witness Ciferri and read from at the February 28, 2006 hearing.

370)    On or about March 1, 2006 I sent Ciferri a letter requesting that my workers

compensation mail/package that she was in receipt of be sent to me.

371)    On or about March 6, 2006 I received a response from Ciferri indicating that DOT's

workers' compensation representative had requested the hearing minutes be sent to them.

372)    On or about March 10, 2006 I received my mail/package from that DOT's workers'

compensation representative at the New York State Insurance Fund, this package also

included my original letter to Cifferi.

373)    Neither party had the right to open and use my mail/package. They obstructed justice by

not giving me my mail/package that I paid for and needed to have prior to the workers'

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

compensation hearing where they both read from it several times. Both parties knew my name and address. These actions were in retaliation for my filing an internal and external complaint regarding the nude art and the termination of my employment as a result of my complaints.

374)   DOT's workers' compensation representative at the NYS Insurance Fund is fully aware that all correspondence to me must be submitted through my attorney. DOT's workers' compensation representative should not have mailed anything directly to me.

375)   On or about February 28, 2006 CM made me return the canvass letters to DOT R8 indicating that I was declining due to the travel requirement.

376)   On information and belief, DOT R8 had a vacant TCA1 title at the time when DOT assigned me duties of this title. DOT could have hired and employed someone in the correct title to perform these duties instead of assigning me "out of title" work.  This is detrimental to my career development and I was under paid for the "out of title" work.

377)   From May 2005 through January 2006 I received no preferred list canvassing letters from DOT informing me of open positions that were being filled for which I was eligible under Section 73 reinstatement and asking if I wished to be considered for said positions. I received no preferred list canvass letters during this time, although positions were available and filled for which I was eligible under Section 73 reinstatement. I inquired why I had not received any preferred list canvass letters and expressed concern to DCS and DOT that these positions would be filled without considering my preferred status.

378)   Positions were also available and filled by DOT between September 2005 and June 2006 for which I was Section 55b and regular reinstatement eligible.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

379)     On January 25, 2006 I wrote a letter to CM that I was available for work in Rensselaer

County, that I had seen numerous vacancy postings in the engineering technician series at the

DOT, and that I had not received any preferred list canvass letters, and inquired why I had

not received any preferred list canvass letters, and expressing concern that these positions

would be filled without considering my preferred status.

380)     On January 26, 2006 I sent DCS a letter requesting that my Preferred List/Reemployment

Roster card be updated, indicating Rensselaer, Albany, and Greene counties as counties that I

was available for reemployment under Section 73.

381)     On February I, 2006 faxed a letter to DCS CM inquiring about my reemployment rights

and the vacancy postings that I should be on a preferred list for.

382)     Despite the fact that I did not list Dutchess County - my last county of employment with

DOT in R8 - as a county in which I could be reinstated, the only canvass letters for open

positions which I received from January 2006 through April 2006 were from Dutchess

County.  In addition, the preferred list canvass letters that I did receive did not list the correct

county of employment for the open positions as required under Section 73.  DOT deliberately

sent me the preferred list canvass letters to harass me for filling sexual harassment complaint

with the New York State Division of Human Rights.

383)     I received preferred list canvass letters from R8, Dutchess County on January 30, 2006

(three positions), February 28, 2006, April 26, 2006 (for an ET), and April 27, 2006 (five

positions.)

384)     I received no preferred list canvass letters for any counties other than my previous county

of employment - Dutchess County in R8 - a county in which the DOT and DCS had medical

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

documentation that indicated I was a person with a disability and I was eligible to report to

work with the DOT provided that is was not in DOT R8.

385)    On or about January 26, 2006 voice message DOT R8 Construction has ET, SET, and

PET openings nothing else is known.

386)    On or about February 11, 2006 CM required that I provide confidential medical

documentation or I would be removed from the preferred list.  The CM should not have

required confidential medical information from me because EHS is the sole office that

monitors employee's confidential medical records.

387)    On February 11, 2006 I faxed DCS CM a copy of my resume and confidential application

form required to request reinstatement to state service, and again inquired about my

reemployment rights under Section 73.

388)    On or about February 13, 2006 CM, O'Connor faxed my resume to the DOT for

consideration for the engineering technician vacancies posted on or about January 12, 2006

MO and R1, a total of three ET positions and four SET positions.

389)    On February 17, 2006 Janis Morris of DOT emailed Lisa O'Connor of CS CM stating

that DOT did not contact me about R1 or MO positions because it as not in the vest interest

of the State to reinstate me. Many other people were copied on this email. This ruined my

reputation.

390)    On or about from December 16, 2003 through June 15, 2006 DOT made the following

appointments in the MO and/or R1: more than three (3) CC1 appointments, more than fifty

(50) CE1 appointments, more than twenty (20) Clerk 1 appointments, more than eight (8) ET

appointments, more than five (5) PET appointments, fourteen (14) SET appointments, five

(5) SC1 appointments, more than five (5) Drafting Technician appointments  - a total of more

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

than one hundred (100) appointments of records for which I could have/should have been employed, transferred to, or reinstated. In addition, in the past seven years DOT has made more than thirty (30) 55b appointments in the MO and could have appointed me through this program.

391)    It appears that some of the DPT appointments of record may have been temporary appointments. I had indicated that I was available for both temporary and permanent work.

392)    On information and belief, the appointments of record do not include all the appointments that DOT made during this time period such as employees that transfer for one program area to another in the same regional office who remain in the same title.

393)    It is also my belief that DOT also made 55b appointments and did not consider me as a 55b candidate at any time.

394)    I have missed out on many employment opportunities, have been denied employment and/or reemployment, had my employment terminated without just cause, and even though my 55b letter of interest was on file I was not given equal opportunity to be employed as a person with a disability. These actions have caused me financial harm and mental anguish.

395)    DOT could not wait to terminate my employment terminating me before one year of continuous absence. DOT did not make a reasonable accommodation for my disability, did not make a reasonable effort to resolve the hostile work environment created as a result of my sexual harassment complaint, did not give me equal reemployment opportunities for regular employment/reemployment or 55b employment and refused to consider my application for employment and reemployment even at the request of CS CM in retaliation for complaining about the nude art and for my filing an internal and external complaint.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

396)   DOT did not want to employ me and did not and would not consider me for any reinstatement position that I was eligible which included employment opportunities under the 55b program. DOT also discriminated against me as a person with a disability.

397)   On or about February 28, 2006 CM demanded that I complete and return the preferred list canvass letters that I received from R8 even though I stated on several occasions that I believed that I received the preferred canvass letters in error, and had provided confidential medical documentation to this office that confirmed that I was medically cleared by EHS to return to work with the DOT provided that it was not in R8.

398)   I was again threatened by O'Connor that my name would be removed from the preferred list if I did not return the preferred list canvass letters to R8 immediately, this which caused me tremendous mental anguish and almost caused me to have a relapse.

399)   On or about March 24, 2006 DOT posted for two ET positions, one position for an SET in the MO, I sent my EOI with cover letters stating my experience and my eligibility for reinstatement.  I received no response from the DOT.

400)   On April 2, 2006 I faxed CM a follow-up letter to my inquiries regarding my reemployment rights of more than sixty days and that again there were current vacancies with my former employer in a county that I was available for work.

401)   On or about April 13, 2006 I received a voice message from CM, DOT is considered on agency, received decision from legal a short time ago, setting up programming on how it is should be set up.

402)   On April 28, 2006 I spoke with CM following up on my re-employment inquires, I was told that a written response would take some time.


**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

403)   On or about April 8, 2006 I mailed my expression of interest for two (2) ET and one SET vacant positions in DOT MO.

404)   On or about April 14, 2006 I called DOT Design Quality Assurance Bureau (DEQAB) to verify that my leter was received, stated I was very interested, had previous work experience with Dave Kent, scope of the vacant position is very similar to last position I held at DOT.

405)   On or about April 25, 2006 I was contacted by DEQAB regarding the SET position, interviewed on April 28, 2006 inquired as to my preferred list status.

406)   On April 29, 2006 I mailed the required DOT application for employment to DEQAB and on May 1, 2006 I mailed thank you letters along with three letters of reference. On May 16, 2006 I made follow-up call.

407)   On or about April 19, 2006 I sent a certified letter to Morris, Director of Personnel in the MO, who oversees all DOT regional personnel offices, to reiterate my expression of interest for the two ET and one SET positions, stated that I was seeking a Section 73 reinstatement and I did not receive preferred list canvass letters for these positions, inquired as to my status regarding the preferred list.  I never received a response.

408)   On May 16, 2006 I called MO Personnel Preferred List Unit to check on my preferred status and to check if the vacancy posting of March 24, 2006 were filled yet.

409)   On May 3, 2006 I reiterated in a letter to the DCS that I could not work R8 - which included Duchess County.  I included with this letter a note from my doctor confirming that I could work full time provided it was not in R8.

410)   On or about May 3, 2006 CM again required that I provide confidential medical documentation and required that I send a letter requesting permission to decline my last county of employment.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**

411)   CM told me these were preconditions to my remaining on the preferred list. However, the CM does not have jurisdiction to request employees' confidential medical records. CM should not have required me to write a letter requesting to decline my last county of employment as a condition to remain on the preferred list. These actions were retaliation by the CM to harass me in retaliation for filing the charges herein aforementioned with the NYS Department of Human Rights.

412)   Section 73 does not require the last county of employment to be selected as a county for reemployment nor is there any rule or regulation or policy that makes this a requirement.

413)   On or about May 4, 2006 DOT posted one SET position in the MO. I sent my EOI with cover letters stating my experience and my eligibility for reinstatement. I received no response from the DOT.

414)   On or about May 5, 2006 I received a letter from CS confirming that my name would stay active on the preferred list and that I was allowed to decline Duchess County and still remain active on the preferred list, several weeks after legal had made a decision.

415)   On or about May 16, 2006 I called MO personnel to verify that I was on the preferred list for the MO, inquired as to the filling of the two positions for the ET, one position for the SET in DEQAB.

416)   On or about May 16, 2006 I called DEQAB, decision was in the "process," executive management taking a longer than usual, I expressed that I was still very interested.

417)   On May 18, 2006 the DOT posted an ET position for which I received no preferred list canvass letter, as I should have.

418)   On May 31, 2006 I faxed CM a follow-up letter to my inquires regarding my reemployment rights under Section 73 of more than one hundred and twenty days.

**THIRD AMENDED COMPLAINT - ATTACHMENT #1**